SUPERIOR COURT 
 
 ENFIELD BUILDERS, INC. v. THE COMMONWEALTH OF MASSACHUSETTS, DIVISION OF CAPITAL ASSET MANAGEMENT AND MAINTENANCE

 
 Docket:
 2184CV01075-BLS2
 
 
 Dates:
 April 14, 2025
 
 
 Present:
 Kenneth W. Salinger Justice of the Superior Court
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 DECISION AND ORDER ALLOWING DEFENDANT’S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF’S MOTION TO STRIKE
 
 

 The Division of Capital Asset Management and Maintenance for the Commonwealth of Massachusetts (“DCAMM”) hired Enfield Builders, Inc. (“EBI”) to build a new medical and intake facility at the Worcester County Jail. Although the construction contract provided that time was of the essence, EBI did not come close to completing the project on time. DCAMM claims that EBI also committed other material breaches of its contractual obligations. DCAMM eventually terminated the contract, hired another firm to complete the Project, and invoked its contractual right to have EBI reimburse and indemnify it for additional costs that DCAMM incurred to complete the project.
EBI brought suit claiming that the delays were DCAMM’s fault and that EBI is entitled to be paid in full under the contract or to additional compensation on theories of quantum meruit and unjust enrichment. DCAMM asserts counterclaims for breach of contract, breach of warranty, breach of the implied covenant of good faith, and to enforce its indemnification rights.
The Court will deny EBI’s motion to strike parts of the summary judgment record. It allow in part DCAMM’s motion for summary judgment with respect to EBI’s claims, EBI’s liability under DCAMM’s counterclaims for breach of contract and contractual indemnification, and EBI’s affirmative defense of failure to mitigate damages except as to the roofing system. These rulings establish that DCAMM is entitled to recover at least $7,449,415.05 from EBI, plus reasonable attorneys’ fees and court costs. The Court will deny in part the summary judgment motion with respect to whether DCAMM is entitled to recover an additional $1,415,703.00 that it paid to replace the roofing system on the new facility, and with respect to DCAMM’s counterclaim for breach of warranty. Finally, the Court will grant summary judgment in favor of EBI on DCAMM’s counterclaim for breach of the implied covenant of good faith.
 
                                                            -1-
 
1. Motion to Strike. EBI asks the Court to strike an affidavit authenticating documents as having been produced by one side or the other during discovery, to strike those documents on the ground that they have not been properly authenticated, and to strike a second affidavit concerning the total amount paid by DCAMM to complete the Project after EBI’s contract was terminated. This motion to strike is without merit.
1.1. Authentication Affidavit. The challenged affidavit of Attorney Kenneth Thayer merely establishes that the first 85 summary judgment exhibits were produced during discovery or constitute an excerpt of deposition testimony, and that exhibit 86 is an accurate copy of an affidavit by Catherine Walsh.
It is commonplace and entirely appropriate for an attorney representing a party moving for summary judgment to authenticate documents as having been produced during discovery. Indeed, EBI relies upon the affidavit of its counsel, Attorney Fredrick Hedberg, to authenticate numerous documents that were produced during discovery and marked as exhibits during depositions. There is no reason why Attorney Hedberg is competent to do so but Attorney Thayer is not.
Since EBI does not actually challenge the authenticity of any of the documents authenticated in the Thayer affidavit, no further proof of authenticity is required. Indeed, under these circumstances, the Court could consider these documents as being authentic without relying on the Thayer affidavit.
If a party seeking summary judgment relies on documents the authenticity of which is not challenged by the opposing party, those documents are “proper parts of the summary judgment record” even if the moving party presents no affidavit or other evidence authenticating the documents. See City of Boston v. Roxbury Action Program, Inc., 68 Mass. App. Ct. 468, 469 n.3, rev. denied, 449 Mass. 1101 (2007). Where the authenticity of an exhibit has not been attacked, it “must be accepted as true.” Northeastern Malden Barrel Co. v. Binder, 341 Mass. 710, 713 (1961); Gahn v. Leary, 318 Mass. 425, 427 (1945). In any case, Massachusetts law does not require trial judges to be “overly technical” in determining what they “should consider on a motion for summary judgment.” Correllas v. Viveiros, 410 Mass. 314, 317 (1991).
EBI’s throw-away argument that “[n]ot all documents produced in discovery or that are part of the discovery record are admissible” is correct but beside the point. EBI makes no attempt to show that any of the documents submitted by DCAMM is inauthentic or that it is inadmissible for any other reason.
 
                                                            -2-
 
1.2. Extra Cost Affidavit. EBI’s challenge to parts of Ms. Walsh’s affidavit is also without merit. Ms. Walsh testifies under oath that (among other things): (I) she has been a project manager at DCAMM for about 20 years, and was DCAMM’s project manager for construction of the Worcester County Jail Medical and Intake Facility; (ii) she reviewed all payment requisitions for the Project “to determine whether, in my opinion, the invoices sought payments for charges that were reasonable and necessary in connection with the work that had been performed;” (iii) DCAMM made payments totaling $8,865,118.05 to complete the Project after it terminated EBI; (iv) Walsh “approved those payments as reasonable and necessary in order to complete the project in order to achieve a final facility that could be used, as intended, by the Worcester County Sheriff’s Office;” and (v) Walsh understands that those payments are detailed in a particular summary judgment exhibit.
Ms. Walsh’s opinion that these payments were reasonable and necessary is relevant and admissible. The reasonableness of those payments is relevant to DCAMM’s counterclaim for indemnification. And Ms. Walsh’s opinion is admissible because she has the requisite expertise to determine whether costs incurred for the Project were reasonable, her opinion would assist the factfinder if the case were to go to trial, and her opinion is based on her actual, real-time review of payment requisitions as the Project was being completed.
Whether compensation for construction work performed was reasonable is a question of fact, and therefore a topic as to which expert testimony is permissible, not a legal conclusion as to which expert opinion would be improper. See Towner v. Bennington Const. Co., Inc., 2005 WL 3105653, at *11 (Mass. Super. Oct. 12, 2005) (Rufo, J.); see also In re Will of Crabtree, 449 Mass. 128, 142 (2007) (reasonableness of compensation for trustee is question of fact); Guenard v. Burke, 387 Mass. 802, 808 (1982) (reasonable compensation owed to attorney with unenforceable contingent fee agreement is question of fact); Irwin v. Degtiarov, 85 Mass. App. Ct. 234, 238–239 (2014) (reasonableness of veterinary costs is question of fact); Crowley v. Communications for Hospitals, Inc., 30 Mass. App. Ct. 751, 756 (1991) (reasonableness of compensation for officers of corporation is question of fact).
That Ms. Walsh’s opinion as to reasonableness may touch on ultimate issues raised by the breach of contract and indemnification counterclaims does not make it inadmissible either. See, e.g., Welch v. Keene Corp., 31 Mass. App. Ct. 157, 165 (1991); Mass. Guide. Evid. § 704.
 
                                                            -3-
 
2. Factual Background for Summary Judgment Motion. The summary judgment record establishes that the following facts are true.
EBI contracted with DCAMM in March 2018 to build a medical and intake facility at the Worcester County Jail and House of Correction (the “Project”). EBI was the low bidder; it agreed to complete the Project for $16.9 million.
2.1. Key Terms and Conditions. EBI’s contract with DCAMM provided that “time was of the essence” (General Conditions Art. VI, § 1.C). The contract required EBI to achieve “substantial completion” within 487 days after the date to commence work specified in the accompanying “Notice to Proceed,” and to bring the work to “final acceptance” within 45 days thereafter (Art. 2). The Notice to Proceed informed EBI that the contract time would commence on March 22, 2018. EBI was therefore required by contract to achieve substantial completion by July 22, 2019, and final acceptance by September 5, 2019.
The General Conditions of this contract, and the DCAMM Standard Specifications incorporated into this contract, included the following additional terms and conditions.
o EBI was required to “carefully study” all plans and specifications, and also to “take field measurements and verify field conditions,” and to report “at once … any questions, errors, inconsistencies, or omissions.” (General Conditions Art. IV, § 1.)
o EBI was “solely responsible” for supervising and directing all work on the Project, and was also responsible for coordinating the work of its subcontractors. EBI agreed to be held responsible for all acts and omissions of its employees, agents, and subcontractors, and for their agents and employees. (General Conditions Art. IV, § 2.)
o DCAMM’s Designer could reject any materials that did not conform to the contract documents, and EBI “shall remove rejected materials.” (General Conditions Art. V, § 6.)
o If EBI incurred any delays, it was required to take steps to get the Project back on schedule “at no additional cost to the Commonwealth” and to provide updates explaining how it would return the Project to the approved schedule. (DCAMM Standard Specifications § 013200, ¶ 1.5(A)(4)(e).).
 
                                                            -4-
 
o Any change order requests had to be submitted in writing and in accord with the contract procedures. (General Conditions Art. VII, §§ 1.A and 1.B).
o EBI’s deadline for completing the Project could be extended only by authorized change orders submitted and approved in accord with Art. VII of the General Conditions. (General Conditions Art. VII, § 1.A; DCAMM Standard Specifications § 013200, ¶ 6(a).).
o EBI had to comply with strict requirements to request and obtain any extension of the deadline for completing the Project. To obtain a time extension, EBI was required to submit a change order request as provided in Articles VI and VII of the General Conditions, and to do so “within 20 days of the occurrence of the event alleged to be the cause of the delay.” The contract provides that failure to submit a written change order request for an extension within that time period “shall preclude [EBI] from subsequently claiming any time extension due to said delay.” (General Conditions Art. VI, § 1.C.; accord DCAMM Standard Specifications § 013200, ¶ 1.5(A)(6)(b).)
o DCAMM had the contractual right to terminate EBI’s contract for cause if EBI did meet “the rate of progress required for the timely completion of the Work” or did not “prosecute the Work or any portion thereof to the standards required under this Contract or has otherwise breached any material provision of this Contract,” among other permissible reasons. (General Conditions Art. XVII, § 1.A.)
o If DCAMM exercised its right to terminate the contract for cause, it was entitled to complete the Project and charge EBI the expense incurred to do so, and hold EBI and its sureties liable for all damages for breach of contract (General Conditions Art. XVII, § 1.B.)
o In addition, EBI is contractually obligated to indemnify DCAMM “from and against all claims damages, losses and expenses,” including court costs and attorneys’ fees, arising out of or resulting from EBI’s performance of its work on the Project or from any breach of contract by EBI. (General Conditions Art. XV, § 1.) This obligation survives any termination of the contract. (Id. § 3.)
 
                                                            -5-
 
2.2. EBI’s Actual Knowledge of Delays. Throughout its work on the Project, EBI knew that it was not on schedule to meet the contractual completion date, and that as time went on it was falling further and further behind schedule.
In late June 2018, just three months after the start of work on the Project, EBI’s scheduling consultant informed EBI that the estimated completion date for the Project was already 52 days later than the final completion date required by contract. The consultant indicated that this was mostly due to delays in EBI’s work on the foundations.
In July 2018, EBI provided written notice to its scheduling consultant that the consultant had delayed the project by not properly performing its obligations as a subcontractor to EBI.
On August 20, 2018, EBI provided written notice to its concrete supplier that it had delivered defective product. EBI sent this notice because the contract required that concrete poured for the building foundation achieve a minimum compressive strength of 5,000 pounds per square inch, but field testing showed that the concrete poured in five locations was achieving compressive strength of only between 3,810 and 4,170 psi. Subsequent testing of eight other locations showed compressive strength ranging from 3,994 to 4,947 psi.
At about the same time, DCAMM and its architect instructed EBI that it needed to remove and replace the non-conforming concrete. On August 24, DCAMM instructed EBI to submit its “proposed method and sequence of deconstruction … and the schedule for the prompt removal of the defective material and replacement thereof.”
Seven days later, EBI told DCAMM in writing that it was “preparing to remove and replace the rejected concrete,” subject to additional testing to identify all areas where non-conforming concrete had been installed. In September 2018, EBI hired a contractor to extract concrete core samples in areas where the foundation had not achieved the required compressive strength. EBI learned that this contractor severed steel rebar in some locations, and had to make repairs as directed by DCAMM.
On October 2, 2018, DCAMM wrote EBI that it had received letters from EBI that addressed “some, but not all, of the concrete that was deemed to be defective,” that DCAMM was still waiting for EBI to supply “a complete action plan” for addressing the non-conforming concrete, and that EBI should not undertake any additional work “in conjunction with the concrete on site …
 
                                                            -6-
 
until a comprehensive corrective plan has been vetted through and approved by” DCAMM and its architect. EBI has not identified any evidence suggesting that DCAMM was wrong, and that as of this time EBI had already submitted a plan for addressing all of the non-conforming concrete.
Six days later, EBI reversed course from its prior agreement to remove and replace the non-conforming concrete. EBI took the position that the installed concrete had eventually met the 5,000 psi strength requirement, none of it was defective, and therefore none of it had to be removed and replaced. EBI stated that it reserved its right to seek a concrete extension based on the time spent addressing the delays caused by the repeated prior failures of the installed concrete to pass the required strength tests. As discussed below in § 2.3 of this decision, however, EBI waited another seven months to submit a proposed change order seeking such an extension.
In late October 2018, EBI’s new scheduling consultant informed EBI that the Project was 207 days behind schedule, and sought a meeting to discuss ongoing “delays with the foundation work.”
In mid-November 2018, EBI asked DCAMM to reconsider its decisions to reject and have EBI remove and replace the non-conforming concrete. EBI enclosed a letter from a consulting engineer who confirmed that (contrary to EBI’s assertion in early October) some of the concrete still did not meet contractual strength requirements, but suggested that it was “just a matter of time” until the poured concrete eventually met the 5,000 psi strength criterion. EBI therefore asked DCAMM to accept the non-conforming concrete “and allow it to remain in place.” EBI warned there would probably be additional, “significant delays and adverse scheduling impacts” if DCAMM continued to insist that the non-conforming concrete be removed and replaced.
In December 2018, DCAMM sent EBI a written “Notice to Cure and Notice of Schedule Deficiencies.” This notice stated that EBI had delayed the Project by delivering and installing defective concrete, and then exacerbated the problem by severing several reinforcing bars while take core samples of the concrete foundation. DCAMM directed EBI “to provide an acceptable recovery schedule within 14 days.”
DCAMM arranged for the Project architect to perform additional testing and analysis of the strength of the poured concrete. In January 2019, the architect reported that, although the poured concrete still failed to achieve 5,000 psi compressive strength in all tested locations, it was strong enough “to perform
 
                                                            -7-
 
as intended” and “is structurally considered acceptable, provided any damage caused by testing has been repaired through approved procedures.”
Based on this new evaluation, DCAMM agreed in January 2019 to permit the concrete to remain in place.
In late January 2019, EBI was informed by its scheduling consultant that the Project was 254 days behind schedule.
In February 2019, EBI provided written notice to its site subcontractor that it had delayed the project by not supply enough properly skilled workers or proper materials to construct the Project in a timely manner.
In mid-March 2019, a consultant informed EBI—which in turn informed DCAMM—that the Project was still 254 days behind schedule, and that all but 39 days of that delay was caused by the installation of non-conforming concrete by EBI’s subcontractor. This consultant found that work on the Project was effectively stopped from August 21, 2018, through January 1, 2019, because the concrete poured by EBI’s subcontractor did not meet the contract specifications. The consultant also concluded that there were “concurrent” delays attributable to DCAMM, due to allegedly inadequate design plans and slow responses to requests for information. But the consultant concluded that “the delay associated with the rejected concrete and resolution process” was “driving” the delays shown in its critical path method modeling. The consultant provided this information to EBI on March 13, 2019, and EBI forwarded it to DCAMM on March 18, 2019.
In July 2019, EBI’s scheduling consultant estimated that the Project schedule was now 353 days behind the completion deadline.
In late October 2019, EBI’s scheduling consultant estimated that the final completion date would now be November 23, 2020, or 445 days after the contractual deadline.
2.3. Proposed Change Orders Seeking Extensions. During its work on the Project, EBI submitted only three proposed change orders (PCOs) that requested additional time beyond the contractual deadlines.
First, EBI submitted PCO 16-A on April 30, 2019, seeking a 10 day extension and an extra compensation to complete additional underground utilities and slab work to accommodate an additional dental chair. DCAMM approved this request.
 
                                                            -8-
 
Second, EBI submitted PCO 32 on May 1, 2019, seeking a 248 day extension. In support of this request, EBI submitted another copy of the March 13, 2019, analysis showing that almost all of the delays the led to the extension request were the result of EBI’s subcontractor pouring concrete that failed to meet contract strength specifications.
DCAMM denied PCO 32 on May 30 on the ground that the delays giving rise to the extension request were due to EBI’s breach of contract in supplying non- conforming concrete. In its denial notice, DCAMM reminded EBI of its contractual obligation to mitigate the scheduling delays caused by the pouring of non-conforming concrete.
Third, EBI submitted PCO 62 on December 17, 2019, seeking a 427 day extension. DCAMM denied this request.
2.4. Failure to Complete Project and Termination of Contract. EBI did not comply with the requirement that the Project be substantially complete by July 23, 2019. Construction of the Project was less than 40 percent complete as of that date. As noted above in § 2.2 of this decision, EBI knew that the Project was 353 days behind schedule by that point in time.
EBI similarly did not meet the September 22, 2019, deadline for bringing the Project to the “final acceptance” stage. As noted above, as of about one month after that deadline the Project was 445 days behind schedule.
DCAMM issued a second notice of default to EBI on November 18, 2019.
Roughly two months later, on January 24, 2020, DCAMM gave notice that it was  terminating EBI’s contract. By this time, the Project was still loss than   50 percent complete, and DCAMM had paid EBI roughly $7 million for its work and the work of its subcontractors on the Project.
2.5. Replacement Contractor. In April 2020, DCAMM retained Gilbane Building Company, Inc., to succeed EBI and complete the Project. DCAMM paid Gilbane a total of $8,865,118.05 to complete the Project.
This amount included extra costs totaling $1,415,703.00 to replace the roofing system that had been partially installed but not completed by EBI. In January 2022, two years after DCAMM terminated EBI’s contract, the architect issued a letter recommending that DCAMM reject the roofing system that EBI had installed because water had penetrated the roofing system and building materials below and caused significant damage. DCAMM accepted and acted on that recommendation.
 
                                                            -9-
 
Whether this water damage occurred before or after DCAMM terminated EBI’s contract is in dispute. EBI has submitted an expert report concluding that
(I) EBI installed the original roofing system “in general conformance with the Contract Documents and industry standards,” (ii) since on-site testing revealed no water within the roofing assembly as of April 2020, most likely no water penetrated the roofing system until well after EBI no longer had control of the Project and the job site, and (iii) most likely the water damage was caused by Gilbane’s delay in finishing the original roofing system.
DCAMM issued a certificate stating that the Project was substantially complete in March 2022.
3. Summary Judgment on EBI’s Claims. DCAMM is entitled to summary judgment in its favor as to each of EBI’s claims.
3.1. Failure to Approve Extensions. EBI’s claims that DCAMM breached the contract’s express and implied terms by not approving two requests for extensions of time to complete the Project fail as a matter of law because EBI waited far too long to submit those proposed change orders (“PCOs”).
As discussed above in § 2.1 of this decision, the contract provided that time was of the essence, and that any request to extend the deadlines for completing the Project had to be submitted pursuant to the contractual change order process “within 20 days of the occurrence of the event alleged to be the cause of the delay.” The contract also specified that failure to do so bars EBI from seeking or claim any right to an extension based on that delay.
EBI failed to submit either of the two disputed PCOs that sought extensions of time within 20 days of the cause of the delay, or even within 20 days of EBI obtaining full information about the cause and amount of the delay.
3.1.1. Proposed Change Order 32. EBI submitted PCO 32, seeking a 248 day extension, on May 1, 2019. This request was based on delays resulting from EBI’s subcontractor pouring concrete that did not meet contractual strength specifications and “concurrent” delays allegedly caused by DCAMM providing inadequate design plans and slow responses to requests for information.
This extension request was untimely. EBI was aware of the delays due to non- conforming concrete starting in August 2018, and knew that those delays ended around late January 2019 after DCAMM was convinced to accept the non- conforming concrete. EBI was similarly aware of its own complaints about
 
                                                            -10-
 
plans and specifications and of its own requests for information back in 2018. In any case, the analysis of these delays that EBI attached to PCO 32 to justify that requested extension was provided to EBI by its scheduling subcontractor on March 13, 2019, some 49 days before EBI submitted this change order request.
In sum, EBI did not come close to requesting an extension within 20 days of becoming fully aware of the claimed causes of the relevant delays. And the undisputed evidence establishes that EBI did not submit this change order request “at the earliest time practicable.” Contrast Farina Bros. Co. v. Commonwealth, 357 Mass. 131, 139–140 (1970).
3.1.2. Proposed Change Order 62. EBI did not  submit  PCO  62,  seeking a 427 day extension, until December 17, 2019. The analysis submitted in support of this request asserted that this claimed delay came about because the planned window for a subcontractor to produce architectural precast panels was lost because the Project architect issued a bulletin on February 25, 2019, announcing changes in the layout of lighting fixtures. Though this bulletin was rescinded by DCAMM on September 9, 2019, EBI contended that in the meantime it had lost its opportunity to get the architectural precast panels made on time. According to EBI, this period of delay ended on October 22, 2019, when it received a response to request for information #192. EBI contended that the delay impacts associated with this bulletin “were not fully realized” until October 22, 2019.
This means that, at the very latest, EBI had to submit a PCO requesting an extension within the next 20 days, i.e. by November 11, 2019. Instead, however, EBI waited almost two months from the time it had “fully realized” all of the delay impacts to submit PCO 62. That was well over 20 days after the last possible justified date for seeking this extension. Once again, the undisputed evidence therefore establishes that EBI did not submit its claim “at the earliest time practicable.” Contrast Farina Bros., 357 Mass. at 139–140.
Furthermore, EBI’s scheduling contractor provided the delay analysis that EBI submitted in support of PCO 62 on November 21, 2019. Yet EBI did not even succeed in submitted this change order within 20 days after compiling all of the information and analysis that it ultimately relied upon in support of the request. Instead, it waited another 26 days to submit PCO 62.
In sum, as a matter of law DCAMM’s denial of PCO 62 was lawful because this change order request was untimely.
 
                                                            -11-
 
3.1.3. Stevens Report and Affidavit. EBI’s reliance on the expert analysis of Glen Stevens, as to who bears responsibility for what part of the Project delays, is misplaced. Since EBI never submitted a timely change order request for an extension based on any of these delays, this analysis is beside the point.
Stevens contends that EBI suffered a total of 458 calendar days of delay to the Project’s substantial completion date before DCAMM terminated EBI’s contract and that 13 of those delay days were recovered, 37 days of delay were attributable to EBI, and DCAMM was responsible (or at least shared responsibility) for the remaining 408 days of delay.
To the extent that any of the delays addressed by Stevens formed part of the basis for PCO 32 or PCO 62, those requested extensions were untimely for the reasons discussed above.
Any of the delays addressed by Stevens that did not form part of the basis for a change order request for an extension are now irrelevant. As noted above, the contract provides that failure to submit a written change order request for an extension “within 20 days of the occurrence of the event alleged to be the cause of the delay … shall preclude [EBI] from subsequently claiming any time extension due to said delay.” (General Conditions Art. VI, § 1.C.; accord DCAMM Standard Specifications § 013200, ¶ 1.5(A)(6)(b).)
As a result, nothing in Stevens’ expert report or related affidavit creates any material issue. EBI’s claim that it was entitled to a contract extension fails as a matter of law because EBI failed to submit a timely proposed change order requesting such an extension.
3.1.4. Other Arguments. EBI’s argument that it “substantially complied” with the contractual requirements for seeking extensions of time, because DCAMM had actual notice of the delays as they were occuring and EBI eventually submitted actual change order requests,” is unavailing. The contract provided that to obtain an extension of time EBI was required to submit a PCO within 20 days of the case of the delay. EBI’s failure to do so bars its claims that it was entitled to an extension. Cf. Glynn v. City of Gloucester, 21 Mass. App. Ct. 390, 396–398 (1986). Merely putting DCAMM on notice of delays, and then following up with a change order request months or years later, did not suffice under the contract.
EBI’s alternative argument that DCAMM waived the contractual notice requirements for extensions of time is also without merit. Waiver occurs when
 
                                                            -12-
 
a party intentionally gives up a known right under the contract. See Psychemedics Corp. v. City of Boston, 486 Mass. 724, 745 (2021). “Waiver must be shown clearly, unmistakably, and unequivocally.” Id., quoting Boston v. Labor Relations Comm’n, 48 Mass. App. Ct. 169, 174 (1999). EBI has mustered no evidence showing any waiver here.
3.2. Termination of the Contract. For much the same reasons, EBI’s claims that DCAMM acted unlawfully in terminating the contract also fail as a matter of law. As noted above, DCAMM had the contractual right to terminate the contract if EBI did not complete the project on time. See General Conditions Art. XVII, § 1. It is undisputed that EBI did not come close to meeting the contractual deadlines for achieving substantial completion (July 22, 2019) or for bringing the Project to final acceptance (September 5, 2019). DCAMM was therefore within its rights to terminate the contract in January 2020.
DCAMM did not waive its right to terminate the contract by issuing the second notice of default in November 2019 but waiting two more months before opting to terminate. See generally Dana v. Wildey Sav. Bank, 294 Mass. 462, 467 (1936) (failure to exercise contractual rights immediately does not constitute waiver of other’s party’s breach of contract). As explained in a leading treatise on contract law:
Mere silence, acquiescence, or inactivity is insufficient to show a waiver of contract rights where there is no duty to speak or act. Similarly, forbearance to assert or insist upon a right does not, by itself, constitute waiver. A party’s reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligation under the contract should not ordinarily lead to a waiver of the innocent party's rights.
15 Richard A. Lord, Williston on Contracts § 39:35 at 653 (4th ed. 2000).
EBI’s arguments that DCAMM was not entitled to terminate for delays in performance because the overall delay was not material, and in any case DCAMM was purportedly to blame for much (but not all) of the delay period, are without merit.
The contract provided that time was of the essence, and that the Project had to be completed by the dates specified in the contract. “[A] ‘time is of the essence’ clause means that contractual deadlines will be strictly enforced.” Owen v. Kessler, 56 Mass. App. Ct. 466, 466–467 (2002). The time-is-of-the-essence clause makes clear that EBI’s promise to complete the Project on time was an “essential
 
                                                            -13-
 
and inducing feature of the contract,” which means that EBI’s failure to meet the Project completion deadlines was a material breach of the contract. See G4S Technology LLC v. Mass. Technology Park Corp., 479 Mass. 721, 733–734 (2018) (failure to pay subcontractors on time was material breach).
EBI’s assertion that it was not required to show “complete and strict performance” of the Project deadline requirements because they had nothing to do with the design or construction of the Project is nonsensical and has been rejected by the Supreme Judicial Court.
A building contractor “cannot recover on the contract itself without showing complete and strict performance of all its terms” that relate to the actual design and construction of the project. G4S Technology, 479 Mass. at 730–731, quoting Andre v. Maguire, 305 Mass. 515, 516 (1940). In contrast, a failure to comply with other contractual requirements that do not concern design or construction must be analyzed under a “materiality standard,” not under the “complete and strict performance” standard. Id. at 732–733. In other words, a contractor that breaches requirements unrelated to project design or construction may recover under the contract so long as those breaches were not material. Id. at 733–734.
The SJC has made clear that if a contractor “does not complete the project” on time, in accord with a contractual deadline, that breach concerns construction and therefore is subject to the “complete and strict performance” standard. See G4S Technology, supra, at 733 n.16, citing Peabody N.E., Inc. v. Town of Marshfield,
426 Mass. 436, 441 (1998) (analyzing contractor’s failure to substantially complete project on time under “complete and strict performance” standard). EBI’s assertion that delay is always “subsidiary to and does not directly involve design and construction work” is not supported by any cited authority, cannot be squared with Peabody N.E., and was rejected in G4S Technology. The failure by EBI to complete this Project on time necessarily relates to construction of the facility and therefore must “be analyzed under complete and strict performance.” G4S Technology, supra.
As a result, a contractor like EBI that fails to substantially complete a construction project by the contractual deadline, in strict compliance with the contract terms, is not entitled to recover on the contract unless the “failure to complete on time was caused solely” by the party that hired the contractor. Peabody N.E., 426 Mass. at 441. So long as EBI “is also to blame for the delayed completion of the work,” it cannot recover on the contract. Id.
 
                                                            -14-
 
It follows that DCAMM acted lawfully when it exercised its right to terminate the contract because EBI had not completed the Project on time.
The summary judgment record makes clear that, even assuming DCAMM is in part to blame for delays, EBI is also at least partly responsible for failing to complete the Project on time. It is undisputed that EBI’s subcontractors poured concrete that did not meet specifications, and then severed rebar when taking core samples to test the poured concrete later on. It is also undisputed that EBI’s installation of non-conforming concrete and the need to repair the rebar damage resulted in the Project being delayed for months. As discussed in § 3.1.4 above, although EBI tries to shift blame for much of this delay to DCAMM, EBI’s own expert concedes that EBI’s delivery of non-conforming concrete delayed completion of the Project by at least 37 calendar days.[1]
Nothing more is required to establish that EBI is at least in part to blame for not meeting the contractual deadlines, and that DCAMM therefore had the right to terminate the contract for cause. EBI’s contention and expert report suggesting that DCAMM is partly responsible for delays do not create a material issue of fact because, even assuming that this expert opinion were admissible, it would
 
--------------------------------------------
 
[1] Mr. Stevens’ assertion that DCAMM is responsible for the additional concrete- related delays after September 11, 2018, appears to be inadmissible because it does not have a reliable factual basis. See generally Commonwealth v. DiCicco, 470 Mass. 720, 729 (2015) (if expert witness “cannot provide a reliable factual basis for his conclusions, the trial judge must exclude the opinion from reaching the trier of fact”); Palandjian v. Foster, 446 Mass. 100, 107–110 (2006) (affirming exclusion of expert opinion because plaintiff did not show that it had reliable factual basis). First, Stevens asserts that DCAMM never responded to EBI’s September 11 remediation plan. In fact, however, on October 2 DCAMM told EBI that this plan was incomplete because it did not address the removal of all non-conforming concrete. As noted in § 2.2 above, EBI does not identify any evidence that contradicts DCAMM’s conclusion that EBI had not submitted a complete remediation plan for removing and replacing the non- conforming concrete. Second, Stevens also asserts that DCAMM never responded to a “second remediation plan dated November 12, 2018.” In fact, however, that submission was not a remediation plan at all, but instead a request by EBI that DCAMM accept the non-conforming concrete. As discussed above, it took two months for necessary additional testing and analysis to be completed, after which DCAMM agreed with this proposal.    In sum, contrary to Stevens’ assertion, the undisputed underlying facts appear to show that EBI was responsible for the entire concrete-related delay, which lasted five months from mid-August 2018 until mid-January 2019.
 
                                                            -15-
 
not establish that the failure to complete the Project on time was caused solely by DCAMM. See Peabody N.E., 426 Mass. at 441 (where contractor and town were both to blame for delayed completion of project, contractor’s own delay “was not excused”).
3.3. Inaccurate Plans and Specifications. In design-build projects like this one, the party that “furnishes plans and specifications for a contractor to follow --- impliedly warrants their sufficiency for the purpose intended.” Coghlin Elec. Contractors, Inc. v. Gilbane Bldg. Co., 472 Mass. 549, 555–556 (2015), quoting Albert v. Commonwealth, 357 Mass. 306, 320 (1970). EBI’s efforts to invoke an alleged breach by DCAMM of its implied warranty that its plans and specifications were sufficient, as both a defense to having its contract terminated and as the basis for an affirmative claim for breach of warranty, fail as a matter of law and because of a dearth of supporting evidence.
3.3.1. No Excuse for Failing to Meet Project Deadline. EBI contends that DCAMM materially breached the contract “from the outset” by failing to provide adequate plans and specifications, and that as a result “DCAMM is precluded from demanding performance by EBI.” That is just wrong.
If DCAMM had materially breached the contract from the start, as EBI argues, that would merely have given EBI the right to walk away from and not perform under the contract. “[A] material breach by one party excuses the other party form further performance under the contract.” Prozinski v. Northeast Real Estate Services, LLC, 59 Mass. App. Ct. 599, 610 (2003), quoting Ward v. American Mut. Liab. Ins. Co., 15 Mass. App. Ct. 98, 100 (1983); accord, e.g., Quintin Vespa Co. v. Construction Service Co., 343 Mass. 547, 554 (1962) (same in context of construction contract).
But that is not what EBI did. Instead, EBI opted to continue to perform under its contract. It was therefore obligated to comply with, and could not simply ignore, the terms of the contract. See Kass v. Todd, 362 Mass. 169, 175–176 (1972) (where one party commits a material breach of contract, but the other party elects to continue performing, the contract remains in effect and both parties are bound by its terms); accord Lander v. Samuel Heller Leather Co., 314 Mass. 592, 598 (1943).
EBI’s reliance on Central Ceilings, Inc. v. Suffolk Constr. Co., 91 Mass. App. Ct. 231 (2017), is misplaced. In that case, a general contractor was barred from relying upon a no-damages-for-delay clause to defeat compensation claims by a subcontractor because it was undisputed that the general contractor “had
 
                                                            -16-
 
communicated that no extensions of time would be granted” even if a request for an extension was timely and had merit, and therefore “the possibility of extensions had been foreclosed.” Id. at 236–237. EBI has not mustered any comparable evidence in this case. Though DCAMM lawfully denied EBI’s two very untimely extension requests, there is no evidence that it told EBI no extensions would ever be granted under any circumstance.[2]
EBI cites no authority suggesting that EBI’s failure to complete the Project on time may be excused due to an alleged breach of the implied warranty as to the sufficiency of the plans and specifications, without EBI complying with the contractual requirement that it had to seek an extension through a proposed change order within 20 days of learning of the cause of any delay.
3.3.2. No Evidence of Resulting Damage. EBI correctly notes that if a contractor incurs extra costs that could not have been anticipated due to a breach (by the project owner or general contractor) of the implied warranty that plans and specifications are sufficient for the purpose intended, then the contractor has a viable claim to recover those extra costs. See Coghlin Elec. Contractors, Inc. v. Gilbane Bldg. Co., 472 Mass. 549, 555–556 (2015); Albert v. Commonwealth, 357 Mass. 306, 320 (1970).
But EBI points to no evidence suggesting that it incurred extra costs due to defects in plans or specifications.
DCAMM is entitled to summary judgment on EBI’s claim for breach of warranty (in count II) because damages is an essential element of that claim, see Coghlin and Albert, and EBI has not mustered any evidence that it incurred any extra costs (that DCAMM has not already compensated it for) or suffered any other damages as a result of DCAMM’s alleged breach of warranty. See generally Roman v. Trustees of Tufts College, 461 Mass. 707, 711 (2012) (failure to
 
--------------------------------------------
 
[2] EBI contends at page 29 of its opposition that “DCAMM repeatedly made it clear it would not grant time extensions or equitable adjustments for any reason, regardless of the merit of EBI’s request.” But it does not identify any supporting evidence. EBI cannot defeat DCAMM’s summary judgment motion by making conclusory assertions without citing evidentiary support. See Chang v. Winklevoss, 95 Mass. App. Ct. 202, 214, rev. denied, 482 Mass. 1105 (2019) (court may not credit factual assertions “not supported by the summary judgment record”); Bergendahl v. Massachusetts Elec. Co., 45 Mass. App. Ct. 715, 718-719, rev. denied, 428 Mass. 1111 (1998), cert. denied, 528 U.S. 929 (1999) (“mere assertions of the existence of disputed facts without evidentiary support cannot defeat [a] summary judgment motion”).
 
                                                            -17-
 
establish essential element of claim); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991) (failure to muster sufficient evidence to make out claim).
3.4. Other Counts. DCAMM is also entitled to judgment in its favor on the four other claims that EBI asserts in counts III, IV, V, and VI of its complaint.
3.4.1. Implied Covenant. In its opposition memorandum, EBI’s defense of its claim for breach of the implied covenant of good faith and fair dealing is quite abbreviated. EBI first summarizes the nature of this implied covenant, quoting three appellate decisions on unchallenged legal principles. It then lists a litany of alleged misconduct by DCAMM that purportedly violated this covenant, in a single run-on sentence that provides no citation to the summary judgment record and points to no evidence that EBI suffered any damages as a result.
These conclusory, perfunctory assertions that DCAMM violated this implied covenant do not rise to the level of meaningful argument. Since EBI has not provide any substantive argument in opposing DCAMM’s request for summary judgment on the implied covenant claim, the Court considers any such argument to have been waived. See Commonwealth v. Johnson, 470 Mass. 300, 319 (2014) (trial court judge “acted well within his discretion” in declining to consider unsupported and undeveloped argument in support of motion); see also Halstrom v. Dube, 481 Mass. 480, 483 n.8 (2019) (argument raised “in a cursory fashion” is waived). A party that opposes a motion in the Superior Court must submit a written memorandum “that includes a statement of reasons, with supporting authorities, that the motion should not be allowed.” Sup. Ct. Rule 9A(a)(2). Parties therefore waive issues or arguments that they do not raise and properly develop in their written opposition.
3.4.2. G.L. c. 30, § 39N. EBI’s purported claim under G.L. c. 30, § 39N, fails for several reasons.
First, the summary judgment record establishes that DCAMM fully complied with this statute. Section 39N merely requires that certain kinds of public construction contracts include a particular provision that permits contractors to seek a price adjustment if they encounter unexpected “subsurface or latent physical conditions.” The contract in this case included that provision. See General Conditions Art. VII, § 4.B. Any claim that DCAMM violated this contract provision would have to be asserted as part of EBI’s claim for breach of contract, not in a separate cause of action purportedly brought under the statute. Nothing in § 39N suggests that the Legislature was intending to create a new private right of action to enforce the substance of the required provision.
 
                                                            -18-
 
Cf. Nordberg v. Commonwealth, 96 Mass. App. Ct. 237, 239 (2019) (“We will not construe a statute to establish a private right of action without express terms or clear legislative intent to that effect.”).
Second, EBI does not argue and points to no evidence suggesting that it sought and was entitled to an equitable price adjustment because of unexpected subsurface or latent physical conditions at the Project site.[3] Thus, even if the Court were to construe count IV of the complaint as asserting a claim for breach of contract, DCAMM would still be entitled to summary judgment in its favor on that claim.
3.4.3. Unjust Enrichment. EBI’s claim for unjust enrichment damages fails because the parties’ rights and obligations are defined by a valid contract. See Metropolitan Life Ins. Co. v. Cotter, 464 Mass. 623, 641 (2013); Boston Med. Ctr. Corp. v. Secretary of Executive Office of Health & Human Servs., 463 Mass. 447, 467 (2012).
EBI’s assertion that it is entitled to recover on an unjust enrichment theory for testing, inspection services, and other unspecified tasks that “were not part of EBI’s scope of work” is without merit. The contract makes clear that all work “necessary to develop, construct and complete” the Project are within the contractual scope of work and therefore governed by the parties’ contract. See General Conditions Art. II, § 2. It also provides that EBI is not entitled to any payment for extra work unless it seeks and obtains approval for a proposed change order. Id. Art. IV, § 1.A. Indeed, EBI concedes that its unjust enrichment claim is an attempt to recover costs for which it submitted PCOs.
Since any request to be compensated for extra work is governed by the parties’ contract, EBI may not seek additional compensation under an unjust enrichment theory. See Zarum v. Brass Mill Materials Corp., 334 Mass. 81, 85 (1956) (plaintiff may not seek recovery on principles of unjust enrichment where valid contract covers subject matter of dispute).
 
--------------------------------------------
 
[3] Any contractor seeking an equitable price adjustment, for example due to encountering unexpected conditions, must follow the procedures set out in the contract. Sutton Corp. v. Metropolitan Dist. Comm’n, 423 Mass. 200, 207 (1996). Failure to do so “precludes recovery.” Glynn v. City of Gloucester, 21 Mass. App. Ct. 390, 396 (1986). In other words, if a construction contractor fails to follow the remedies established by the contract, then any “additional costs were incurred unilaterally at its own expense” and may not be recovered from the public contracting agency. Id. at 398.
 
                                                            -19-
 
3.4.4. Quantum Meruit. EBI’s separate claim on a quantum meruit theory also fails as a matter of law.
“To recover under quantum meruit in a construction case, a contractor must prove both substantial performance of the contract and an endeavor in good faith to perform the work fully.” G4S Technology, 479 Mass. at 735. The contractor in G4S Technology provided substantial performance by completing the fiber optic network according to its design. Id. at 736.
Here, in contrast, the summary judgment record shows that EBI did not come close to achieving substantial performance. It is undisputed that, when its contract was terminated six months after the July 2019 substantial performance deadline, EBI had still finished less than 50 percent of the work on the Project. “[W]here so large a proportion of the work remained unperformed,” EBI may not recover on a quantum meruit theory. See S. Onorato Corp. v. Levin, 348 Mass. 740, 742 (1965) (performance of less than half of total work not substantial), quoting Nevins v. Ward, 320 Mass. 70, 74 (1946) (performance of roughly three- quarters of total job not substantial); accord Green Manor Const. Co. v. Highland Painting Service, Inc., 345 F.2d 657, 660 (1st Cir. 1965) (performance of less than half the work not substantial).
And, since the summary judgment record establishes that DCAMM was within its rights to terminate the contract, EBI cannot show that it is entitled to a quantum meruit recovery on the theory that DCAMM prevented it from substantially performing its contractual obligations. Contrast Frank Fitzgerald, Inc. v. Pacella Bros., Inc., 2 Mass. App. Ct. 240, 242 (1974).
4. Summary Judgment on DCAMM’s Counterclaims. DCAMM is entitled to summary judgment on some but not all of its counterclaims. The Court will order that judgment enter in EBI’s favor on the counterclaim for breach of the implied covenant of good faith and fair dealing.
4.1. Termination of the Contract and Indemnification. For the reasons discussed in § 3.2 above, DCAMM is entitled to summary judgment in its favor as to EBI’s liability for breach of contract because the contract specified that time was of the essence and the summary judgment record establishes that EBI was responsible at least in part for its failure to complete the project on time.
As a result, EBI is liable (under General Conditions Art. XV, § 1, and Art. XVII,
§ 1) to reimburse and indemnify DCAMM for all expenses that it incurred to complete the Project, any other damages for EBI’s breach of contract, and all
 
                                                            -20-
 
court costs and attorneys’ fees that DCAMM reasonably incurred because of EBI’s breach of contract.
DCAMM seeks to recover the $8,865,118.05 that it paid Gilbane to complete the Project after EBI’s contract was terminated. This amount includes extra costs totaling $1,415,703.00 to replace the roofing system, plus an additional $7,449,415.05 to complete the rest of the Project.
Whether DCAMM is entitled to recover the $1.4 million that it paid to replace the roof turns on disputed issues of material fact and therefore cannot be resolved on summary judgment. As discussed above in § 2.5 of this decision, EBI has presented evidence that could support a finding that the water damage to the roofing system did not occur until well after EBI had been removed from and was no longer responsible for the Project.
But the summary judgment record establishes that DCAMM is entitled to recover at least $7,449,415.05 in completion costs, plus reasonable attorneys’ fees and court costs in an amount to be established later, from EBI. DCAMM has presented unrebutted evidence that the amount of these additional completion costs was reasonable.
EBI’s argument that “DCAMM has provided no evidence that it mitigated its damages” is unavailing. Mitigation of damages is an affirmative defense. Pehoviak v. Deutsche Bank Nat. Trust Co., 85 Mass. App. Ct. 56, 65 (2014). The burden is on EBI, the defendant, to prove by a preponderance of the evidence that DCAMM failed to make reasonable efforts to mitigate damages. Kiribati Seafood Company, LLC v. Dechert LLP, 478 Mass. 111, 123–124 (2017). Since EBI did not must any evidence sufficient to show any failure to mitigate damages, DCAMM is entitled to summary judgment in its favor on that issue. Id.
4.2. Breach of Implied Warranty. EBI’s contract includes an implied warranty that it would complete the Project in a workmanlike manner and exercise the standard of care required of contractors working on similar projects. “When a party binds himself by contract to do a work or to perform a service, he agrees by implication to do a workmanlike job and to use reasonable and appropriate care and skill in doing it.” Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 439 Mass. 387, 395–396 (2003), quoting Abrams v. Factory Mut. Liab. Ins. Co., 298 Mass. 141, 143 (1937). This implied warranty applies with full force in construction contracts. See George v. Goldman, 333 Mass. 496, 497 (1956) (contract to build a dwelling house).
 
                                                            -21-
 
DCAMM claims that EBI breached this implied warranty by deviating from plans and specifications with respect to window and door locations, failing to achieve weathertightness (thereby causing water damage), and installing other defective material. For the reasons discussed in EBI’s opposition, there are disputed issues of material fact as to whether EBI breached its implied warranty in any of these ways and, if so, whether those breaches caused DCAMM to suffer damages. The Court must therefore deny DCAMM’s request for summary judgment as to its counterclaim for breach of warranty.
4.3. Breach of the Implied Covenant. DCAMM argues that EBI’s breach of its express contractual duties—by failing to complete the Project on time, and by not installing proper materials and not properly supervising its subcontractors at least with respect to the concrete foundation—necessarily constitutes a breach of the implied covenant of good faith and fair dealing as well. Not so.
“Not every breach of contract … is a breach of the implied covenant of good faith and fair dealing.” Nagel v. Provident Mut. Life Ins. Co. of Philadelphia,       51 Mass. App. Ct. 763, 768 (2001). To establish a breach of the implied covenant, a party “has the burden of proving a lack of good faith.” A.L. Prime Energy Consultant, Inc. v. Mass Bay Transp. Auth., 479 Mass. 419, 434 (2018), quoting Robert and Ardis James Foundation v. Meyers, 474 Mass. 181, 189 (2016). Proof that a party breached an express term of a contract is insufficient to establish a further breach of the implied covenant without proof that the breaching party did not act in good faith in performing its contractual duties. Nagel, supra (affirming summary judgment as to breach of express terms but reversing as to breach of implied covenant).
DCAMM does not identify any evidence in the voluminous summary judgment record that would support an inference that EBI did not act in good faith in attempting to carry out its contractual duties. Since DCAMM cannot muster sufficient evidence to establish an essential element of its claim for breach of the implied covenant, and therefore cannot prove that EBI committed “any separate and distinct breach of [the] implied covenant,” the Court concludes that EBI is entitled to summary judgment in its favor on the claim that it violated the implied covenant. See DiFlorio v. DePiero, 1999 WL 1204019, at *7 (Mass. Super. Ct. Sept. 28, 1999) (Sossman, J.); see generally Roman,      461 Mass. at 711 (2012) (failure to establish essential element); Kourouvacilis, 410 Mass. at 711 (failure to muster sufficient evidence to make out claim).
 
                                                            -22-
 
In the exercise of its discretion, the Court will therefore grant summary judgment in EBI’s favor on this claim even though EBI did not move for summary judgment. See Mass. R. Civ. P. 56(c) (“Summary judgment, when appropriate, may be rendered against the moving party.”); Petrillo v. Zoning Bd. of Appeals of Cohasset, 65 Mass. App. Ct. 453, 460–461 (2006) (affirming sua sponte grant of summary judgment for non-moving party).
ORDERS
Plaintiff’s motion to strike (docket no. 60) is denied.
Defendant’s motion for summary judgment (docket no. 47) is allowed in part as to all of Plaintiff’s claims, Plaintiff’s liability for breach of contract and contractual indemnity under counts I and V of Defendant’s counterclaims, so much of Plaintiff’s mitigation of damages defense that does not concern the roofing system, and Plaintiff’s liability for at least $7,449,415.05 plus reasonable court costs and attorneys’ fees in an amount that must still be determined.
This summary judgment motion is denied in part as to Defendant’s counterclaim for breach of warranty, Plaintiff’s mitigation of damages defense with respect to the roofing system, and DCAMM’s claim that it is entitled to recover an additional $1,415,703.00 that it paid to replace the roofing system.
Pursuant to Mass. R. Civ. P. 56(c) the Court hereby grants partial summary judgment in Plaintiff’s favor on Defendants’ counterclaim for breach of the implied covenant of good faith and fair dealing.
A final pretrial conference will take place on June 5, 2025, at 2:00 p.m. in Suffolk Superior Courtroom 1017. The parties shall file their joint pretrial memorandum by May 29, 2025.